**UNITED STATES of America**
v.
**Lawrence THOMPSON, Defendant.**

**UNITED STATES of America**
v.
**Marvin VINCENT, Defendant.**

**UNITED STATES of America**
v.
**Harold BOGGINS, Defendant.**
Crim. Nos. 2129–70, 1828–70 and 793–71.

United States District Court,
District of Columbia.
July 31, 1973.

statutory ceiling is necessary in order to provide these attorneys with "fair compensation." My approval is required in accordance with the Criminal Justice Act, 18 U.S.C. § 3006A(d)(3). Because these applications raise common, important and recurring issues involving the administration of the statute in the District of Columbia Circuit, I have treated them collectively for purposes of disposition.

## I.

In *Thompson*, counsel was appointed to represent the indigent defendant on charges of first and second degree murder, armed robbery, assault with intent to kill, and related offenses. Counsel's commendably thorough and fully documented [1] application claims compensation for 212 hours spent in the preparation and presentation of the defense of which 25 hours were "in court." The District Judge certified that this case involved "extended or complex representation" and approved a fee of $4,493 computed at the maximum statutory rates of $30 per hour for "in court" time and $20 per hour for "out of court" time.[2]

My consideration of this application requires a review of recent statutory revisions to and judicial interpretations of the applicable law. In 1970 Congress amended the Criminal Justice Act expanding its coverage,[3] providing for public defender organizations,[4] broadening the availability of public funds for defense services,[5] increasing the hourly rates of compensation for appointed counsel,[6] raising the statutory limit of

BAZELON, Chief Judge, District of Columbia Circuit:

In each of these cases, the District Judge has found that the services rendered by appointed counsel constituted "extended or complex representation" and that a fee in excess of the $1,000

1. *See* United States v. Naples, 266 F.Supp. 608 (D.D.C.1967); 18 U.S.C. § 3006A (d)(4).

2. Counsel was appointed to represent the defendant on September 6, 1971, the order of appointment providing that it was "nunc pro tunc as of December 2, 1970." *See infra*, pp. 12–16. The application for compensation excludes any legal service rendered prior to August 25, 1971, well after the effective date of the 1970 amendments to the statute.

3. 18 U.S.C. § 3006A(a).

4. 18 U.S.C. § 3006A(h).

5. 18 U.S.C. § 3006A(e).

6. 18 U.S.C. § 3006A(d)(1). The new rates are $30 per hour for "in court" services and $20 per hour for "out of court" services unless the Judicial Council of the Circuit establishes a different rate which may not exceed the minimum hourly rate for such services as fixed by a local bar association. *See* H.R.Rep.No. 91–1546, 91st Cong., 2d Sess. at 10 (1970), U.S.Code Cong. & Admin.News 1970, p. 3982. This Circuit has provided

counsel's compensation from $500 to $1,000,[7] and permitting compensation in excess of this limit under certain circumstances. At issue here is the latter provision which now reads:

> *Payment in excess of any maximum amount* provided in paragraph (2) of this subsection *may be made for extended or complex representation whenever* the court in which the representation was rendered, or the United States magistrate if the representation was furnished exclusively before him, certifies that the amount of *the excess payment is necessary to provide fair compensation* and the payment is approved by the chief judge of the circuit. 18 U.S.C. § 3006A(d)(3). (emphasis added)

■ Prior to these amendments, compensation in excess of the statutory limits was available only in "extraordinary circumstances" upon a finding of "protracted representation." *E.g.,* United States v. Harper, 311 F.Supp. 1072 (D. D.C.1970), United States v. Lowery, 261 F.Supp. 396 (D.D.C.1966). The amended statute substitutes "extended or complex representation" as the relevant criteria for excess compensation. The legislative purpose was explained as follows:

*Section 1(d)(3)* provides for waiver of maximum amount and payment in excess of those amounts for extended or complex representation when necessary to provide fair compensation and upon approval of the chief judge of the circuit. This change from the 1964 act is based on the finding of the Oaks' report [8] that the original language has been given too restricted an interpretation. S. Rep. No. 91–790, 91st Cong., 2d Sess. at 7 (1970); H.R. Rep. No. 91–1546, 91st Cong., 2d Sess. at 10–11 (1970), U.S.Code Cong. & Admin.News 1970, p. 3990.

The deletion of the "extraordinary circumstances" requirement and the reference to the Oaks' report,[9] plainly indicate that the 1970 amendments were intended to ease the eligibility requirements for excess compensation. But to say that the requirements for excess compensation have been eased is not to say that they have been abolished altogether. It was clearly not intended that the trial judge or I sit as clericals, doing nothing more than multiplying hours times the statutory rate to arrive at a fee award; nor that the statutory limitation be waived in every case in which compensation for counsel's services, if computed at maximum hourly rates,

that the statutory rates of $30 and $20 are the maximum rates of compensation. Plan for Furnishing Representation to Indigents in the District of Columbia, Part V (hereinafter cited as "Plan"). *See* 18 U.S.C. § 3006A(a).

7. 18 U.S.C. § 3006A(d)(2). The $1,000 limitation applies to cases such as the one before me in which one or more felonies are charged. Lesser limitations are fixed for misdemeanor cases and for post trial representation.

8. The reference to the "Oaks' report" is to the comprehensive study, "The Criminal Justice Act in the Federal District Courts," commissioned jointly by the Judicial Conference of the United States and the Department of Justice and prepared under the direction of Professor Dallin H. Oaks of the University of Chicago Law School. *See* Subcomm. on Constitutional Rights, Senate Comm. on

the Judiciary, 90th Cong., 2d Sess. (Comm.Print 1969) (hereinafter cited as the Report).

9. In his report, Professor Oaks noted that the major factor in the award of excess compensation under the original act was the amount of time expended by the attorney in the course of the representation. Report at 179–180. In cases where counsel's Criminal Justice Act time fell between $500 and $1,000, Professor Oaks thought the original act was being discriminatorily administered, and he proposed that such discrimination be eliminated by raising the statutory limit to $1,000. Report at 181. That Congress raised the ceiling is not wholly responsive to the points which Professor Oaks made, for his recommendations were based on the assumption that the hourly rates of compensation would be only slightly raised from the then-established $15 and $10 per hour rates. Report at 12–13, 174.

would exceed the statutory limits. The act still calls for an informed judicial determination based upon the facts of the individual case.

Applying the statutory criteria is a frustrating process. It is perhaps unfortunate that Congress did not accede to Professor Oaks' strong recommendation that "more definite standard[s]" and "guidelines" be established. Report at 182. Without such assistance, I am increasingly perplexed in my efforts to administer the excess compensation provisions, and I am fully aware that my frustrations are shared by trial judges and conscientious appointed counsel. However, pending the promulgation of such standards and guidelines,[10] the statute must be administered as best it can, and it seems to me that several factors can be identified.

◼ First, the initial burden is on the attorney seeking excess compensation to provide the trial judge with an application sufficiently detailed to allow an exercise of informed judicial discretion. United States v. Naples, 266 F. Supp. 608 (D.D.C.1967), sets forth the nature of the information which should ordinarily accompany such an application.[11] In some cases, counsel have been permitted to supplement their applications for excess compensation with a *Naples* memorandum after the trial judge has passed upon the bare ap-plication. Hereafter, I will ordinarily follow the course established in *Naples* and return insufficiently detailed applications to the trial court without prejudice to resubmission upon appropriate supplementation. This seems more in accordance with the statutory scheme which requires the initial determination to be made by the trial judge, subject only to review by the chief circuit judge.

◼ Second, when presented with a sufficient application, the trial judge must find that the case involves "extended or complex" representation, a decision calling for careful consideration of the nature of the case, its legal and factual difficulties, the amount and nature of the professional services rendered, and many other such factors. This statutory finding cannot be made by mere reference to the number of hours of service, since the statute requires a determination that such time was "reasonably expended" in the course of the representation. 18 U.S.C. § 3006A(d)(1). Broad categories such as "legal research" or "interviews" or "other services" cannot be found to have been "reasonably expended" unless counsel's supporting memorandum furnishes sufficiently detailed descriptions of the services to warrant that finding. *Cf.* Hardt v. Heller Bros. Co., 171 F.2d 644, 648 (3d Cir. 1948); Kuhn v. Princess Lida of Thurn & Taxis, 119 F.2d 704, 708 (3d Cir. 1941).[12]

10. *See infra*, pp. 24–27.

11. The *Naples* criteria were approvingly discussed in Professor Oaks' report. Report at 180. Of course, the requirement of "extraordinary circumstances" has been abolished by the amended statute, but the detailed information called for by *Naples* is still quite pertinent to the determination that "extended" or "complex" representation is involved, as well as to the fee necessary to provide "fair compensation."

12. The statutory requirement that out-of-court time be "reasonably expended" raises a difficult issue which I identify, but find unnecessary to decide in the cases before me. Is professional time "reasonably expended" when an attorney does legal research which one already skilled in the criminal law would not need to do? Of course, "[n]o attorney is bound to know all the law; God forbid that it should be imagined that an attorney or a counsel, or even a judge is bound to know all the law." Montriou v. Jefferys, 172 Eng.Rep. 51 (N.P. 1825). Even an attorney who keeps abreast of developments in the pertinent areas of criminal and constitutional law will need to conduct research and preparation on the precise points raised by his particular assignment. But since such an attorney brings to his appointment a basic understanding of the recurring issues and the leading cases, he may reasonably be expected to complete the particular task in significantly less time than the attorney who must first acquaint himself with

If the legal or factual difficulties of a particular case reasonably require significantly more professional time than the average felony case, such representation may properly be found to be "complex". If court proceedings, including pre-trial and post-trial hearings, involve significantly more professional time than the average felony case, such representation may properly be found to be "extended." And, of course, excess compensation is warranted in a case involving both "complex" and "extended" representation where the combined in-court and out-of-court services reasonably and significantly exceed that of the usual felony case.

The trial judge correctly found that counsel's representation here was "complex." The files and records, including counsel's detailed supporting memorandum, convincingly demonstrate that this case involved difficult factual and legal issues which were skillfully and throughly investigated, researched

---

the basic principles before turning to the particular problems confronting his client. Whether the time devoted to study and research of elementary matters is "reasonably expended" is a problem that I find exceedingly difficult. On the one hand, the bar has long required its members to maintain competence in the areas in which they are to practice, and it seems generally settled that an attorney may not properly charge his client for the time it takes the attorney to obtain general competence in a particular area of the law. See ABA, Code of Professional Responsibility, EC 6–2, 6–3; DR 6–101. As the Code puts it, " . . . a lawyer generally should not accept employment in any area of the law in which he is not qualified. However, he may accept such employment if in good faith he expects to become qualified through study and investigation, *as long as such preparation would not result in unreasonable delay or expense to his client*." EC 6–3 (footnote deleted, emphasis added). See, Patterson and Cheatham, The Profession of Law 249 (1971). Since this circuit's implementation plan places all members of the bar under the age of sixty on the central appointment file, Plan at Part II(B)(2)(a), it may be that there is a professional obligation to remain reasonably abreast of the developments in the criminal law and that the time expended in that endeavor is not "reasonably expended" within the meaning of the statute.

The statute must be administered "to improve the operation of the Criminal Justice Act of 1964." S.Rep.No.91–790, 91st Cong., 2d Sess. at 1, 11–12 (1970). Involving attorneys who would not ordinarily appear in a criminal case in the day-to-day administration of criminal justice in the District of Columbia may well have significant advantages, not only to the particular defendant, but to the criminal justice system itself. Frequently, those whose daily task it is to administer

criminal justice become accustomed to things as they are and overlook shortcomings which are obvious to an outsider. A fresh view not infrequently brings into focus defects which others have not seen. If this be deemed important, and I am inclined to think that it is, then it may be entirely consistent with the purpose of the statute to deem the time it takes such a lawyer to become familiar with basic principles to be "reasonably expended." On the other hand, appointment, on a rotation basis, of attorneys not familiar with the criminal justice system may result in their client's bearing the cost of their inexperience. While the inexperienced lawyer is not to be condemned for an error bred of his lack of familiarity with criminal law or procedure, it must be remembered that the client is entitled to the *effective* assistance of counsel. *See* Watson v. United States, 141 U.S. App.D.C. 335, 363–364, 439 F.2d 442, 460–461 (1970) (separate opinion of Chief Judge Bazelon); United States v. Price, 141 U.S.App.D.C. 149, 150–151, 436 F.2d 303, 304–305 (1970) (dissenting opinion of Chief Judge Bazelon); Heard v. United States, 121 U.S.App.D.C. 37, 45, 348 F.2d 43, 51 (1965) (statement of Chief Judge Bazelon); Tamm, Advocacy Can be Taught—The N.I.T.A. Way, 59 A.B.A.J. 625 (June 1973); cf. ABA, Code of Professional Responsibility DR 6–101; Bazelon, The Defective Assistance of Counsel, 42 Cinn.L.Rev. 1, 11–14 & 18–20 (1973); The Report at 182. In this regard, the problem of time "reasonably expended" comes full circle to the appointment process itself. *See infra*, pp. 24–27. This matter is deserving of fuller consideration to the end that the "guidelines" and "definite standard[s]" which Professor Oaks hoped would be included in the amended act, Report at 182, may nevertheless be incorporated into this circuit's implementation plan.

and presented. Counsel determined not to raise the defense of insanity only after "a very thorough and detailed investigation, and after consultation with the defendant, his family, and the presiding judge." Counsel did vigorously pursue an effort to establish that a third person, and not the defendant, was the culpable party. Counsel devoted substantial time to preparing requests for instructions; to conducting interviews with potential witnesses and prosecuting attorneys; and to careful study of grand jury testimony, police reports, hospital records and to other matters. Following his client's conviction, counsel prepared and submitted a comprehensive pre-sentencing report for the trial court's consideration.[13] While the trial itself was not unusually long, the pretrial preparation clearly places this case in the "complex" category and warrants compensation in excess of the statutory limitation.

 The trial judge computed the counsel's fee of $4,493 at maximum hourly rates. Consistent with the view taken by other chief judges,[14] I have held that this is not ordinarily the proper method of computing excess compensation, United States v. Harper, 311 F. Supp. 1072 (D.D.C.1970); United States v. Hanrahan, 260 F.Supp. 728 (D.D.C. 1966), and the 1970 amendments do not alter my construction of the applicable statutory provisions. First, although Congress was fully aware of the aforementioned construction,[15] it did not amend the "fair compensation" standard of the original act. Second, the act expressly requires not only a finding of "extended or complex representation," but also a determination that the "amount of excess payment is necessary to provide fair compensation." Had Congress intended the computation of excess compensation to be a mere clerical function once the finding of "extended or complex representation" had been made, the latter provision would have been unnecessary. Finally, the statutory rates of compensation are described as maximum rates, not as the automatic entitlement of counsel for each hour expended in the course of representation.

In United States v. Harper, *supra*, 311 F.Supp. at 1073, n. 9, I indicated I would consider applications for excess compensation computed at the maximum statutory rates "in an extraordinary case" provided the trial judge set forth reasons justifying such an award in an accompanying memorandum. I have received numerous applications for excess compensation computed at maximum hourly rates, but I have never received an application accompanied by such a memorandum. This case is no exception. Nor is there anything in the record demonstrating the requisite "extraordinary" circumstances.

 In the past, I have independently reduced excess compensation awards which were computed at maximum statutory rates. I will no longer do so. The trial judge is in a far better position than I to assess the presence of extraordinary circumstances justifying compensation at maximum rates [16] or to fix a fee sufficient to constitute "fair compensation" at less than maximum rates. My only function under the act is to approve or disapprove, in whole or in part, the determination made by the trial judge. Accordingly, this application will be returned to the trial court for reconsideration. If the trial court concludes that extraordinary circum-

13. *See* United States v. Martin, 155 U.S. App.D.C. 359, 370, 475 F.2d 943, 954–956 (dissenting opinion of Chief Judge Bazelon); ABA Project on Minimum Standards for Criminal Justice, Sentencing Alternatives and Procedures, § 5.1 (Approved Draft, 1971); Bazelon, The Defective Assistance of Counsel, 42 Cinn. L.Rev. 1, 41–46 (1973).

14. *E. g.*, United States v. Dodge, 260 F. Supp. 929 (S.D.N.Y.1966) (Lumbard, C. J.).

15. Report at 179–182.

16. *E. g.*, United States v. Pope, 251 F. Supp. 234 (D.Neb.1966); Report at 173. *Cf.* United States v. Ursini, 296 F.Supp. 1155 (D.Conn.1968).

stances justify excess compensation at maximum hourly rates, the basis for that conclusion must be set forth. If such circumstances are not found, an appropriate fee will be fixed by the court on a basis other than maximum hourly rates.

 In passing, I would also note that the 1970 amendments were clearly intended to ease the financial burden of the attorney called upon to represent an indigent defendant in a federal criminal case. S.Rep. No. 91–790, 91st Cong., 2d Sess. at 14–15 (1970); H.R.Rep. No. 91–1546, 91st Cong., 2d Sess. at 4, 10 (1970). There remains, however, a substantial element of public service on the part of appointed counsel, for Congress made it plain that the fees allowable under the amended act "still [do] not provide full compensation." S.Rep. No. 91–790, *supra*, at 15. These matters must be kept in mind by the court when it fixes "fair compensation," and, in so doing, authorizes the expenditure of a very limited resource. *See* United States v. James, 301 F.Supp. 107, 116 (W.D.Tex.1969).

## II.

*Vincent* presents a different and disturbing problem involving appointment practices in the District Court. Counsel secured an order from a United States Magistrate appointing her to represent her client pursuant to the Criminal Justice Act four months after the client was acquitted of assault on a police officer and related charges. The appointment was made nunc pro tunc as of November 24, 1970, the day on which the attorney had entered her appearance as retained defense counsel. On the basis of this order, the trial judge found that compensation in the amount of $2,620 was necessary to provide "fair compensation" for "extended or complex representation."

 This court held in United States v. Perry, 153 U.S.App.D.C. 101,

471 F.2d 1069 (1972), that the act does not flatly prohibit nunc pro tunc orders when necessary to effectuate the statutory purposes.[17] A retroactive order, however, can only authorize payment for "representation furnished pursuant to the [implementation] plan prior to appointment." 18 U.S.C. § 3006A(b). Thus, for example, when clerical delay prevents the entry of a timely order of appointment or where, as was the case in *Perry*, substantial services are rendered in this court by counsel already appointed to represent the indigent in the District Court, a nunc pro tunc order clearly comports with the statutory goals. In this case, however, the attorney completed all legal services on behalf of her client in accordance with a retainer agreement presumably negotiated before her appearance was initially entered. Whether the act permits a retroactive appointment in these circumstances was left open in *Perry*.[18]

 The Criminal Justice Act is not a form of federal fee insurance guaranteeing payment to counsel for the failure of his retained client to honor a fee agreement. United States v. James, 301 F.Supp. 107, 141 (W.D.Tex.1969). The civil courts are fully capable of providing the attorney with appropriate redress in such circumstances. That the defendant is allegedly in default of a fee agreement is not standing alone, sufficient to warrant an appointment under the act.

The statute and this circuit's implementation plan make explicit provision for the case where a defendant, initially represented by retained counsel, seeks the appointment of Criminal Justice Act counsel, 18 U.S.C. § 3006A(c), Plan Part III(E).

In pertinent part, the statute provides:

If at any stage of the proceedings, including an appeal, the United States

17. *But see,* United States v. Thompson, 356 F.2d 216 (2d Cir.), cert. denied, 384 U.S. 964, 86 S.Ct. 1591, 16 L.Ed.2d 675 (1965).

18. 153 U.S.App.D.C. at 103 n. 13, 471 F.2d at 1071, n. 13.

magistrate or court finds that the person is financially unable to pay counsel whom he had retained, it may appoint counsel as provided in subsection (b) and authorize payment as provided in subsection (d), as the interests of justice may dictate. 18 U. S.C. § 3006A(c).

This circuit's implementation plan provides:

If at any stage of the proceedings, the court or magistrate finds that a party is financially unable to pay counsel whom he had retained, or to obtain other counsel, the court or magistrate may appoint counsel in accordance with the general procedure set forth in this plan. *The attorney appointed may claim compensation for services rendered after the date of his appointment pursuant to the Act. The court or magistrate will ordinarily not appoint the same attorney who was previously retained.* Plan, Part III(E) (emphasis supplied).

These provisions are indicative of the detailed consideration which this matter received in Congress. Professor Oaks' report addressed this issue as well. Report at 52–53, 191–192:

The trouble with appointing retained counsel is that this, in effect, permits the defendant to select his own Criminal Justice Act counsel, whereas all 91 of the district plans expressly forbid this.[19] If counsel who has been retained and partially paid will be appointed under the Criminal Justice Act, then a defendant with some means who can persuade a lawyer to accept his case for partial payment can, in effect, select a Criminal Jus-

tice Act counsel whom he could not afford to pay, whereas a defendant with no means or with small means but no persuasive powers cannot.

If this is occurring in practice, then districts which are permitting it should probably amend their plans. If it is decided that defendants should be awarded some freedom in selecting appointed counsel, a more systematic means of achieving that end should be instituted, one that is available to all defendants. Report at 53.

▮ There is a danger that the client will use the initial retainer to circumvent the prohibition against selection of a particular Criminal Justice Act attorney, or that the attorney will utilize his initial appearance as retained counsel to secure Criminal Justice Act appointments and compensation without regard for the procedures outlined in our implementation plan. Thus, when a defendant represented by retained counsel seeks appointment of that attorney, the defendant and his retained counsel should make a full and complete disclosure [20] to the trial court of the pertinent facts, including the circumstances under which counsel was initially retained; the financial arrangements which were agreed upon; the payments, if any, which the defendant has made to the attorney pursuant to the retainer agreement; and the changed conditions which are alleged to constitute grounds for the appointment.[21] Only then will the trial court be in a position to make an informed disposition of the application including the determination, in an appropriate case, to invoke the provisions of 18 U.S.C. § 3006A(f).[22]

19. *See* Plan, Part IV which provides: "The party shall not have the right to select his appointed counsel from the Public Defender Service, from a panel of attorneys or otherwise."

20. This disclosure could, of course, be sealed to avoid prejudice.

21. In United States v. Holt, Crim. No. 1506-67, I returned a similar application to the District Court for further proceedings including disclosure of "any compen-

sation which counsel may have received pursuant to her retainer agreement. . . . ."

22. 18 U.S.C. § 3006A(f) sets forth the procedures whereby the trial court may direct the defendant to make a contribution to the total costs of the legal services provided him under the act. While there will be cases in which invocation of this provision is inappropriate, it seems to me that an application on behalf of one who

■ Although our implementation plan provides that "ordinarily" retained counsel will not be appointed as Criminal Justice Act counsel, there are circumstances in which it may be appropriate to appoint the retained attorney to continue in the case. An application for appointment should be made at the earliest opportunity to afford the trial court the widest latitude in balancing the need for uniform application of the act with the interests of justice in a particular case, since, as Professor Oaks has observed:

This dilemma cannot be resolved by the application of a hard-and-fast rule. We recommend that whether the retained attorney should be appointed or whether a new attorney should handle the case once the defendant becomes eligible under the Criminal Justice Act should depend on how much work the appointed attorney has already undertaken and whether it appears that the defendant retained an attorney knowing that he could not complete the payments. It may be useful . . . to announce as a guideline that, in general, the retained attorney should be appointed only where: (1) He is willing to accept the appointment on the understanding that his Criminal Justice Act fees will be determined on the basis of the total time he has expended on the case, at Criminal Justice Act rates, less the amount already received from the defendant; and (2) he has completed a substantial amount of work for the defendant that would be wasted, or there are other reasons why substitution of counsel would work to the defendant's disadvantage. Report at 53.

In this case, the application was not only delayed until long after the trial was completed, but also well beyond the maximum period for the submission of Criminal Justice Act vouchers set forth in our implementation plan.[23] The entry of the nunc pro tunc order appears on its face to run afoul not only of the general rule against appointing the retained attorney, but also against the limitation period for Criminal Justice Act claims set forth in the implementation plan.

■ Accordingly, the application will be returned to the District Court in order that inquiry may be made and the record supplemented to reflect the full details of the retainer arrangement, and the reasons for the delay in seeking appointment of counsel under the act. If the court concludes that the purposes of the act and the implementation plan would not be furthered by the appointment of retained counsel or that the delay beyond the claims limitation period set forth in the implementation plan is not excused, I do not believe the statute permits compensation. If the court concludes otherwise, the application is to be reconsidered in accordance with the standards set forth *supra*, pp. 882–887.

■ Another disturbing feature of this application is that it lists eighteen hours of "travel time" for which compensation was sought and approved at maximum statutory rates. This "travel time" is for trips between counsel's office in Washington, D. C. and the courthouse, both of which are in the same postal zone. The Judicial Conference Committee to Implement the Criminal Justice Act addressed the problem of "travel time":

When the travel time of an attorney from his office to and from court is 1 hour or more, the court in its discretion, after taking into consideration all the surrounding circumstances, may allow compensation for time spent in such travel . . .; provided, that such travel is solely on the performance of duties in representing a defendant pursuant to an appoint-

was able to retain counsel in the first instance calls for careful consideration of this alternative. *See* Report at 188, 191–193.

23. The plan provides that "[n]o claim for compensation or reimbursement will be honored unless filed within sixty (60) days of the termination of the representation." Plan, Part V(D).

ment under the Criminal Justice Act . . ., and that compensation shall be allowed only for time spent in travel during the normal working hours of the attorney's office. 1966 Administrative Office Report 51–52.

This travel time provision is intended for "certain widespread districts" where attorneys are accustomed to "driving 50 to 100 miles to arraignments and other court proceedings." Report at 182. I do not believe "travel time" compensation should be afforded counsel with offices in the same postal zone as the United States Courthouse for trips to and from court, even though traffic congestion may cause a particular trip to take a hour or more. The claim for "travel time" compensation is to be deleted from the application upon reconsideration, and the findings of "extended or complex representation" and "fair compensation" are to be reconsidered if appropriate.

### III.

In the *Boggins* case, the defendant was charged with twenty-two separate felonies, including first degree murder, assault on a police officer with a dangerous weapon, and violations of the narcotics laws. The district judge, in a helpful memorandum, detailed the unusual circumstances involved:

On a showing of indigency, Mr. [A], a member of the bar of this court, was appointed to defend Harold L. Boggins, the appointment being made by Magistrate Burnett in a nunc pro tunc order dated April 20, 1971. Mr. [A] continued as counsel for defendant Boggins until March 23, 1972, when his appointment was terminated upon the employment by the defendant of Mr. [B]. On April 28, 1972, Ms. [C], a member of the bar of this court, entered her appearance as co-counsel with retained counsel [B]. On May 10, 1972, after it appeared to the court that the defendant Boggins was not in a position to retain Ms. [C], the court appointed her as counsel under the Criminal Justice Act.

At the time that Mr. [B] appeared as retained counsel and the appointment of Mr. [A] was vacated, the court ascertained that Mr. [B's] experience as trial counsel was considerably limited, and that he had never represented a defendant in a first degree murder case. Since Mr. [D], a member of the bar of this court, had been assisting Mr. [A] during the period when the latter was appointed counsel for defendant Boggins, the court appointed Mr. [D] on April 7, 1972 as amicus curiae.

At the conclusion of the trial, the district judge was presented with three separate applications for compensation under the act. Mr. A sought compensation for the services which he had rendered prior to March 23, 1972; Ms. C sought compensation for the services she had rendered to her formerly retained client pursuant to her appointment under the act; and Mr. D sought compensation for his services as *amicus curiae*. Concluding that Ms. C and Mr. D had rendered "extended or complex representation" to the defendant, the trial judge approved their applications in amounts less than the maximum hourly rates set by the act. Mr. A's application, which involved only pre-trial representation, was found not to warrant a fee in excess of the statutory limit, but was forwarded to me because, when added to the fees approved for Ms. C and Mr. D, excess compensation was involved.

Prior to the 1970 amendments, the statutory limit applied to "a case in which one or more felonies are charged." 18 U.S.C. § 3006A(d) (1966). Under that provision, excess compensation was involved whenever two attorneys represented a defendant and the total amount of their compensation exceeded the statutory limit, even if neither attorney alone received a fee in excess of that limitation. *E. g.*, United States v. Kingston, 256 F.Supp. 859, 860–861 (W. D.Pa.1966) (Staley, C. J.). The statute, as amended, permits payment up to the statutory limit to each attorney appointed under the act. 18 U.S.C. §

3006A(d)(2). The legislative intent is clearly manifested in the committee reports which provide, "*Section 1(d)(2) of the bill eliminates the existing per case basis for payment of fees and replaces it with a more flexible system of maximum payments for each attorney in each case.*" S.Rep.No.91–790, 91st Cong., 2d Sess. at 7 (1970); H.R.Rep.No.91–1546, 91st Cong., 2d Sess. at 10 (1970), U.S. Code Cong. & Admin.News 1970, p. 3990.

The Judicial Conference Guidelines delineate the only circumstance in which my approval is now required for an application requesting less than the statutory maximum:

> If an attorney is substituted for an attorney previously appointed for a defendant in the same case, the total compensation which may be paid both attorneys shall not exceed the statutory maximum for one defendant, unless the case involves extended or complex representation. In such cases . . . the judicial officer may make such apportionment as may be just. Judicial Conference Committee to Implement the Criminal Justice Act, Guidelines for the Administration of the Criminal Justice Act II–8 (1970).

The trial judge's memorandum indicates that Mr. A was replaced not by appointment of substitute counsel but by a retained attorney (Mr. B) and Ms. C was appointed as co-counsel. If the matter ended there, my approval of A's voucher would not be required. But, if Mr. B was then removed or withdrew, *see* pp. 22–23, *supra*, and D was appointed in B's place, then D would be a substitute counsel, bringing the judicial conference rule into play. Even if Mr. D were substitute counsel, however, I agree that this case involved "extended or complex representation," justifying combined compensation to A and D exceeding the statutory maximum. I will return Mr. A's application to the District Court for clarification of whether D was appointed to substitute for A, since that fact determines whether my approval is required.

■ While I agree with the district judge that this 22-count felony case, which took twelve or more days in trial[24] and involved extensive factual preparation, constituted "extended" representation, I cannot approve Ms. C's application on the record before me. Ms. C initially entered this case as retained counsel.[25] Although the trial judge found that the defendant was not able to pay Ms. C, no inquiry seems to have been made into the circumstances which would justify a departure from the implementing plan's requirement that "ordinarily" retained counsel will not be appointed under the act. Similarly, the record does not reflect the results of the trial court's inquiry into the financial arrangements which the defendant made with his retained counsel or Ms. C. The trial judge should review this application in light of the considerations set forth, *supra*, pp. 887–890.

■ There is a second reason why I am returning this application to the trial court. Ms. C's application claims compensation for 128 hours of "in court" time. Her explanatory memorandum states that:

> Trial commenced on Monday 5/15/72 and verdict was rendered on 6/6/72. Each was an 8-hour day and a total of *128 trial hours* was accrued. (Emphasis in original).

By contrast, Ms. C's co-counsel, Mr. D, claimed compensation for only 61.5 hours of "in court" time. The burden is on counsel to keep appropriate records of the services rendered pursuant to ap-

---

24. Ms. C's application for compensation lists 16 trial days. By contrast, Mr. D's application lists only 14 trial days. The docket shows that the jury was impaneled on May 18, 1972 and that there were 12 court days thereafter on which proceedings were held.

25. Ms. C was also the attorney who represented the defendant in *Vincent*.

pointment,[26] and this is particularly true where "in court" time is involved.[27] This application should be reexamined in light of its apparent conflict with co-counsel's application.[28]

Mr. D's application presents the question of whether the act permits compensation on behalf of attorneys appointed as *amicus curiae.* The statute expressly provides compensation on behalf of an attorney appointed to represent "the defendant." 18 U.S.C. § 3006A(b)(c). Since the defendant was charged with a capital offense [29] he was entitled to be represented by two attorneys, 18 U.S.C. § 3005; *see* Plan, Part IV; both of whom are entitled to compensation. United States v. Kingston, 256 F.Supp. 859, 860 (W.D.Pa.1966).

■■■ If the designation of counsel as *amicus curiae* were all that was at issue, I could construe the trial court's order as the appointment of a second attorney on behalf of an indigent defendant in a capital case, and proceed to the merits of the application.[30] But, on the record before me, the defendant appears to have been represented simultaneously by *three* attorneys—Mr. B, whom the defendant retained, and Ms. C and Mr. D, who were appointed by the court. The trial judge, who will be fully familiar with the circumstances of the representation, can quickly clarify this problem. If, as a matter of fact, the retained attorney was either removed from the case or effectively displaced by the two assigned attorneys,[31] Mr. D may simply be considered the second defense counsel in a capital case.

If Mr. D is not the second attorney, the issue becomes more difficult because this circuit's implementation plan does not expressly authorize the appointment of a third attorney in a capital case [32] and the statute does not expressly deal with the issue of compensation for such an appointment.[33] Prior to the 1970 amendments, the Judicial Conference Committee to Implement the Criminal Justice Act construed the statute to provide for the compensation of only one attorney in a criminal case (two in a capital case), ruling that where additional attorneys are appointed they must share the compensation allowed by the statute. Report at 190; 1967 Administrative Office Report 78. The legisla-

---

26. *Cf.* In re Nazareth Fair Grounds & Farmers Market, Inc., 374 F.2d 595, 597–598 (2d Cir. 1967); In re Hudson & Manhattan R. Co., 339 F.2d 114, 115 (2d Cir. 1964).

27. Waiting time is not ordinarily subject to compensation under the statute, and certainly not at "in court" rates. Report at 184–186.

28. Upon reexamination, the trial court will also wish to review counsel's claim for compensation for 20 hours of "out-of-court" services listed on the voucher simply as "travel time." If such time represents trips to and from the courthouse, it must be disallowed. *Supra,* pp. 16–17. If other travel was involved, it must be specified in order that the trial judge can determine that it was in excess of one hour and otherwise "reasonably expended" in the course of the professional representation.

29. The appointment and services involved in this case were rendered prior to the Supreme Court's decision in Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972).

30. This was the course I followed in United States v. Prue, Crim. No. 172–68.

31. While the trial court might remove an attorney upon a finding that the attorney is unable or unwilling competently to represent his client, a trial judge will necessarily be reluctant to do so, because such action raises serious implications about the attorney's professional responsibility, ABA Code of Professional Responsibility DR 6–101.

32. The plan permits appointment of two attorneys in a capital case, and also permits the appointment of a second attorney in a non-capital case upon an express finding that the case is "extremely difficult" and that the "interest of justice" requires the appointment. In the latter circumstance, however, the plan requires these considerations to be set forth in the appointing order. Plan, Part IV.

33. 18 U.S.C. § 3006A(d) merely refers to the compensation of [a]ny attorney appointed pursuant to this section."

tive history of the 1970 amendments indicates an intention to alter this construction. The committee reports state:

> Section 1(d)(2) of the bill eliminates the existing per case basis for payment of fees and replaces it with a more flexible system of maximum payments for each attorney in each case. The act presently provides for a $500 maximum payment in a case in which one or more felonies are charged and $300 in a case in which one or more misdemeanors are charged. The maximum applies to each case irrespective of the number of attorneys appointed by the court. *In practice, that requirement has brought harsh results where more than one attorney was appointed in a difficult case and the maximum case payment had to be fragmented.* Section 1(d)(2) also increases the limit to $1,000 for each attorney in a case involving one or more alleged felonies and $400 for each attorney in a case in which one or more misdemeanors are charged. S.Rep. No. 91–790, 91st Cong., 2d Sess. at 7 (1970); H.R. Rep.No.91–1546, 91st Cong., 2d Sess. at 10 (1970), U.S.Code Cong. & Admin. News 1970, p. 3990; (Emphasis added).

Our implementation plan also recognizes that there is a class of "extremely difficult" cases where "meaningful and effective representation" will require additional counsel to aid in the preparation and presentation of the defense. *See* Plan, Part IV. If Mr. D was appointed as a third defense attorney, the trial court must make the findings and enter an order in the form prescribed by the implementation plan in order for Mr. D to be eligible for compensation pursuant to the act. If, on the other hand, the trial court deter-

mines that the defendant was in fact represented by only two attorneys in this capital case, no express findings are required. In either event, Mr. D must be appointed in accordance with the provisions of the Criminal Justice Act, 18 U.S.C. § 3006A(b), (d), before compensation may be approved.

## IV.

These cases amply demonstrate the need for standards and guidelines for determining what is extended or complex representation, what may properly be considered time "reasonably expended" in the course of representation, the appropriate method of calculating "fair compensation," the circumstances under which it is proper to appoint counsel retroactively to represent a defendant, whether a different standard should be applied when an attorney who initially entered the case as retained defense counsel seeks retroactive appointment under the statute, and the types of cases in which it is consistent with the statutory purposes to appoint additional attorneys to assist in difficult cases. While presented today in the context of excess compensation, these issues have far deeper significance for they affect our continuing effort to provide "meaningful and effective representation" to indigent defendants.[34]

The courts must remain continually mindful both of the burdens and sacrifices which members of the bar daily make in the representation of indigent defendants and of the fact that the public funds available for this endeavor are severely limited. This tension impacts most heavily on the District of Columbia for, in addition to the heavy criminal caseload common to any major metropolitan area, this jurisdiction does not share the administration of criminal justice with state courts.[35]

---

34. This effort necessarily requires careful selection of appointed counsel for, as Professor Oaks has rightly observed, the appointing process "is an essential quality control on the standard of service furnished under Criminal Justice Act appointments." Report at 113.

35. As I write, the local courts of the District of Columbia are rapidly ap-

894

In view of the limited supply of public funds available to compensate appointed counsel, it would seem appropriate to explore methods by which counsel's burden could be eased without measurably increasing the demand for public money. The Judicial Conference of the United States has recommended increasing use of qualified law students [36] and the law schools in this jurisdiction have responded wholeheartedly. Some of the courts in the District of Columbia, including the United States Court of Appeals, have adopted "student-in-court" rules which permit upper division law students, under the direct supervision of members of the bar, to represent indigents in criminal cases. The results have been encouraging. In our court, for example, one program conducted by the Georgetown University Law Center has provided student counsel for a number of indigent criminal appellants. With other members of this Court, I have been impressed with the professional quality of the briefs and oral arguments presented by these students and with the dedicated representation which they have furnished to their clients. At the same time, however, it must be recognized that student representation programs necessarily require competent and

close supervision—an extraordinarily expensive proposition—but an indispensible ingredient if students are to provide effective assistance. While the allocation of law school resources, aided by financial grants, may assist in the administration of criminal justice in this circuit, it is clear that a major commitment from the organized bar is still needed.[37]

Because the Criminal Justice Act must be administered with the ongoing criminal caseload, I have today disposed of the cases before me. I am convinced, however, that there is a great need for a careful study of the issues raised by these cases and the promulgation of guidelines and standards for the administration of the act. The keystone to the effective administration of the Act and full implementation of the Sixth Amendment's promise lies in close cooperation between bench and bar. *See* Argersinger v. Hamlin, 407 U.S. 25, 40, 92 S.Ct. 2006, 32 L.Ed.2d 530 (concurring opinion of Brennan, J.) & 44 (concurring opinion of Burger, C. J.) (1972). Congress recognized this, in part, by expressly providing in the amended statute for the adjustment of rates of compensation to reflect "the minimum hourly scale established by a bar association for

proaching a crisis condition. In a few days, absent emergency legislation, these courts will have no public funds available to compensate counsel appointed pursuant to the Criminal Justice Act. With an ever-mounting criminal caseload, the Superior Court has called upon the bar to represent indigent defendants without compensation if necessary. The bar, in turn, has advised the chief judge of that court that it does not believe its membership, as a whole, has the requisite expertise or available time to respond to this call. The constitutional problems and policy considerations reflected by this situation have divided the courts which have dealt with the matter. *Compare* United States v. Dillon, 346 F.2d 633 (9th Cir. 1965), cert. denied, 382 U.S. 978, 86 S.Ct. 550, 15 L.Ed.2d 469 (1966) and State v. Clifton, 247 La. 495, 172 So.2d 657 (1965) with Bradshaw v. Ball, 487 S.W.2d 294 (Ky.1972) and State v. Rush, 46 N.J. 399, 217 A.2d 441 (1966).

36. Reports of the Proceedings of the Judicial Conference of the United States at 53 (1972).

37. In addition to student representation, there are other ways in which qualified law students may assist members of the bar in the representation of indigent clients. For example, Professor Oaks has recommended use of law students, compensated at modest rates under the act, to perform legal research for appointed counsel. Report at 213–214. In the Northern District of Mississippi, a program to provide law student assistance not only for legal research, but also for investigation and other purposes, has been implemented. Report at 213, 271. Such programs, if properly controlled and supervised, ease the burden placed on counsel by his appointment, lessen the drain on public funds, and involve soon-to-be lawyers in the criminal justice system.

similar services rendered in the district."
18 U.S.C. § 3006A(d). H.R.Rep. No.
91–1546, 91st Cong., 2d Sess. at 10
(1972).

With these considerations in mind, I
have conferred with Charles T. Duncan,
the President of the Bar of the District
of Columbia, and he has named a most
respected member of the Bar, E. Barrett
Prettyman, Jr., as Chairman of a special
committee to study the issue and
present, for the consideration of the ap-
propriate courts and of the Judicial
Council of this Circuit, recommenda-
tions, standards and guidelines for more
effective implementation and adminis-
tration of the Criminal Justice Act in
the District of Columbia.[38] Mr. Pretty-
man is the immediate past President of
the Bar of the District of Columbia and
has made significant contributions to
the bench, the bar, and the community
in his very distinguished career. The
interest of the leadership of the local·
Bar and the choice of Mr. Prettyman as
chairman of this new committee augur
well for the success of the endeavor. I
recognize that the proposed study will be
an arduous and time-consuming task and
will require the full dedication and coop-
eration of the bench and the bar.[39] But
if, as a result of such a study, the or-
ganized bar is able to present construc-
tive recommendations for guidelines and
standards for the consideration of the
judiciary, it will have rendered an im-
portant public service and, perhaps, has-
tened the day when the promise of the
Sixth Amendment and the Criminal Jus-
tice Act becomes a reality for the Dis-
trict of Columbia.

Appropriate orders will be entered.

38. The compensation for and the quality
of representation by appointed attorneys
are inextricably interwoven problems.
Accordingly, I am sure that Mr. Pretty-
man's committee will work closely with
the recently appointed D.C. Bar Commit-
tee on Effective Representation of Indi-
gents. The latter committee, chaired by
Mr. Anthony F. Essaye, another dis-
tinguished member of the Bar, has dili-
gently undertaken the difficult tasks of
assessing the quality of representation af-

forded indigent defendants in the District
of Columbia and of formulating proposals
for the improvement of that representa-
tion.

39. In the past, the law schools located in
the District of Columbia have been un-
stinting in their support of such under-
takings and perhaps these schools will
provide faculty and student assistance in
this important endeavor as well.